Morning, Your Honors. If you may please the court. My name is Mike Johns. I'm here on behalf of the appellants Tim Shalabi and Pyramid Gold, Inc. We're here on an appeal of a summary judgment dismissal of my client's causes of action against BP West Coast Products, LLC. The trial court dismissed Mr. Shalabi's misrepresentation claim and also his gas dealer Bill of Rights statutory claims. And we believe those dismissals were in error. I think that the key here is that the issue here should be on the misrepresentation claim whether or not Mr. Shalabi's reliance was justified under the surrounding circumstances of this particular case. Let me just make sure I understand. I have a very narrow focus on one particular two-word statement, no contamination. Now is that the misrepresentation or is there something beyond that? That is the misrepresentation and it's repeated in a number of different types, times, but it's the same representation and that is the key. It's that no contamination. So I think you were exactly right to zero in on justifiable reliance because in context I just don't see how your client could possibly have relied on taking those two words totally out of context as a literal statement that there was not one ounce of contamination found because that's just not what the rest of the evidence suggested. Well, the report itself, the environmental evaluation report, of course clearly did not state that. So if my client had read that report he would have known that there was indeed some contamination. There's no doubt about that and the trial court is correct in stating that. The issue here is was my client's actions justifiable in relying on the representations, the repeated representations made to him by BP's representatives. And those representations were clearly no contamination. It was not what was actually found in the report. Also, BP states that, well, you know, terms of art, no contamination is contamination less than the threshold, but their statements weren't that at all. My client is not in that area practicing or doing anything that he would have knowledge of terms of art. He is told something specific. What matters to him is the property contaminated. And he's looking forward to getting this report. The documents say that he's going to be doing his own investigation and he can't rely on anything, but at the same time BP goes ahead and goes out of its way to make representations to him about what the report says, and those representations are wrong. Now, maybe they misread the report or maybe they were intentional. They're not. It depends on how you define wrong. I mean, they're correct in the sense that no contamination has been found that rises above a level that's going to require remediation today, right? That is true. And that, of course, would be the most important consideration, I assume, to the buyer. And so I just see this as they're representing that, look, based on what we found, it is going to be your job to go do your own due diligence if you don't want to rely on this report. But based on what this independent third-party expert testing, you know, outfit has found, there's nothing that requires remediation. So you want to go forward with the deal? And he says, yeah, okay. And if they had made those statements, then I would agree with you entirely. Well, here's what they did say. So maybe taking Judge Watford's theme, what they did say in the Second Amendment is that, and Shalabi signs this, he agrees and acknowledges that the Delta report did not reveal the presence of underlying corrective action. And then we also have in this property agreement that he's buying it solely in reliance on his own investigation. So I read those two things and I think, where's the reliance? And that's where, that's the number, the case. But really, those to me are pretty slam dunk unless I'm missing something. So help me out. Well, Your Honor, the first statement there about there not being any contamination found needing cleanup or action, that is not inconsistent with there being no contamination. It's a statement that there's no contamination. I mean, there's no contamination necessary to clean up. Requiring corrective action. But that's not inconsistent with there's no contamination. You have a threshold. If you need five parts a million, if you found four, three, two, one, zero, it's a true statement that's been put in the agreement. In this case, he was told it was zero. There was no contamination. So when he's signing that document, it's not stating there was contamination found but it was below the threshold. It's just making a statement that there's no contamination above the threshold. And that's consistent with what he was told, which was there was no contamination. Now, again, it is true that the documents were saying he was doing his own investigation. But in this case, BP went out of its way to induce him to rely on their statements rather than read the report. How did they do that when they said it's solely in reliance on his own investigation? Well, the document says that. But then we have that Washington, this is Washington law, correct? Yes, it is. We have the Washington principle of, you know, the document. If the document is unambiguous and says what it says, you're sunk. I mean, Washington is pretty harsh on that. Well, and that's what I wanted to get to because that is what the trial court stated in its decision. And it's cited to the Skagit State bank case, which seems to be pretty clear on that point. But Skagit State, I think it's important to look at the distinctions there and then also the further development of Washington law since then. In Skagit Bank, the Skagit State Bank, the bank made no representations whatsoever in that case. The person who was trying to get out of the document he had signed had been given the document by his own business partner and then had relied on his representation and didn't bother to read the documents. There was absolutely no representations made by the bank. So when the bank went to enforce it, there was no reason, there was no issue of misrepresentation by the bank in that case. So the court did note in that case that, yes, the party should have read the document and they have no basis for then avoiding the debt to the bank. But there was no issue in that case of misrepresentation by the bank. Now, that's important because that was a 1988 case. In 2002, the Supreme Court then issued its opinion in Lawyers Title Insurance Corporation v. Bake, which both parties have cited and the court also cited in its case but not for these points. But the significant thing about that case is in that case, the title company was relying on a statement made to it by a law firm and the question was whether or not it was negligent in doing so  and the defendant had cited a scadgent state. And the Supreme Court said that that case did not involve representation, so it did not address the justifiable reliance element of the tort of negligent misrepresentation and shed no light on Washington's adoption or rejection of Section 552A of the Restatement of Torts. That section states that a recipient of negligent misrepresentation is barred from recovery for pecuniary loss, suffered imreliance upon it if he is negligent in so relying. Well, if Washington adopted that, then failure to read the document when you have an obligation would make you negligent and you would be barred. But the Supreme Court in Lawyers Title rejected that and stated we are not going to adopt that because Washington instead is going to rely on its comparative negligence statute that will deal with it as a factor in damages, determining the amount of damages, not a complete bar on the claim itself. That would be too harsh of a result. So it went on to state that reliance is justified when it is reasonable under the surrounding circumstances. So sure, whether or not he should have read the document is a circumstance that definitely a jury should take into account, but it has to look at it in the totality of circumstances. In this case, BP has these documents that state it's not going to make any representations whatsoever and it's going to be its franchisee's responsibility to do that. But it then goes out of its way to repeatedly, at least three times by the person sending the document to him, stating in writing that no contamination is found. And then Mr. Shalabi testified in his deposition and in his declaration in response to summary judgment that three other individuals at BP told him the exact same thing. So the documents that BP has prepared all state we're not going to make representations, but then they go out of their way to make repeated representations of no contamination. And then when it works, when he relies on that, they point to the documents and say, you can't rely on our representations. Well, I think in the totality of circumstances, given what happened here, we are not talking about a simple loan document, as in Skagit State, that someone should easily be able to understand. We're talking about an environmental evaluation report, which isn't something a layman normally would be dealing with. And when he is dealing with his franchisor calling him and congratulating him and saying there's no contamination, he relied on that. It's up to a jury, not the court, to decide was that reasonable in these circumstances. And so we believe it was an error for the court to say, well, based on Skagit State, the 88 case, that had nothing to do with the representation by the party seeking to enforce the document, that there's a blanket rule in Washington that just because he didn't read the document available to him, he has no claim. The law in Washington has evolved, and the lawyer's title case makes it clear that you look at the totality of circumstances, and there is not an absolute bar to a party that was negligent themselves in not reading the documents. Yet also, if that was the case, what BP is trying to argue, that would also fly in the face of the purpose of, the beneficial purpose of the Gaspular Bill of Rights Act. And we believe that also applies here. The trial court's decision on that matter was basically one paragraph saying the RESA, the real estate sale agreement, was not a franchise agreement. So, end of issue. But that misses the point. The statute says, RCW 1920-070, part of the Gaspular Bill of Rights Act, states that it's unlawful for anyone in connection with the offer, sale, or purchase of any motor fuel franchise to directly or indirectly make an untrue statement or omit to make a statement of fact to avoid misleading someone. And 19129-03 goes on to provide that the statute shall be liberally construed to effectuate its beneficial purposes. In this case, there's no doubt that there was not just a transfer of real property going on. There was also a gas deal, a gas agreement, which was a motor fuel franchise agreement. Let's say that we agreed with you on that point. And I see the language you're referring to, the in connection with statement. But then if we just drop down to, you know, subparts 1, 2, and 3, 2 and 3 are just basically restatements of the fraud issue. You just get back to the justifiable reliance problem. So we're going to resolve it on that. And to me, wouldn't we read subparagraph 1 there to say that whatever the misrepresentation you're talking about has to be in connection with the sale of the motor fuel franchise part of the transaction? And here, the misrepresentation goes to the real estate part. I think that that would be the case, Your Honor, if you have a franchisee and then there just happens to be sometime during their relationship they enter into this real property agreement. And it really has nothing to do with the franchise itself. In this case, the franchise agreement, the gas agreement, was being done at the exact same time and was all part and parcel of the RESA. And, in fact, the RESA, paragraph 7 of that, has a requirement that for delivery of documents that the gas agreement be signed and be part of closing. It's all tied together. These are part and parcel of the same transaction. So I would agree that if we were in a franchise relationship and then three years later we decided to buy property and that's all that was happening, that subsection 1 would mean there's no representation being made related to or in connection with the franchise agreement. But in this case, they're all happening at the same time, and you can't have one without the other. Well, sure you can. You can. It didn't happen in this transaction, but you most definitely can. You theoretically could. But in this transaction, it was a requirement that they had to happen together. That's what the parties had agreed to. And because of that, they are tied together. So it was in connection with a gas franchise. And, again, the liberally construed to affect its beneficial purposes, I don't believe that the legislature intended to look at an individual document when it's being all part of a transaction that's happening at the same time. It doesn't want anyone to make misrepresentations as any part of that transaction. Did you want to say anything? I did, so I would like to reserve the balance of my time. Thank you. Good morning, Your Honors. May it please the Court, my name is Dan Oates, and I represent BP West Coast Products. I want to start by addressing an issue that you raised in your questions about what the phrase no contamination meant. And I think to understand what was meant, you actually have to look at the context of what was happening in this transaction at the time. And the context that we have is that we have a contract that's been signed by the parties that defines what relevant contamination is going to be at issue in this transaction sale. The very first agreement signed by the parties in October of 2004 stated that BP was going to investigate the environmental condition of the property to determine whether there was any contamination, which it defined as contamination requiring cleanup under Washington's statutes. Mr. Shalabi had the same understanding. His deposition testimony was that he understood the words clean or no contamination to mean you don't have to go to the Department of Ecology to clean it up, which means it's below corrective action levels. And ultimately, none of that really matters because the issue of whether something is contaminated for purposes of establishing that you don't have to clean it up under Department of Ecology regulations is that they define it as it's already protective of the human health and environment if it's below these levels. So if it's protective of human health and environment, there's no material difference between a little bit of contamination and the contamination requiring cleanup. It's just there's something there. And most properties, including gas stations or any industrial property, are going to have some degree of contamination on it. The question is just whether it's a sufficient amount that it's going to require cleanup because it's not protective of human health and the environment. If we were to disagree with you on the interpretation of the applicability of the motor oil franchise statute and to say, well, it applies here because these are integrally related, how does the argument you just made fit in with subsection one of that about untrue statement or material fact? Well, I think that's a key point, which is that even if you were to disagree and say that we think the statute applies, you still need to prove all of the elements of, just about all of the elements of fraud. Cases have said that under the Washington Gasoline Dealer Bill of Rights Act, essentially all the elements of fraud with the exception of intent to defraud and knowledge of falsity apply. The case law is clear on that. So you still have to prove that it was a material fact that was being misrepresented. And it's not material if it doesn't make any difference whatsoever in the condition and sale of the property. I would also say that counsel represented that it's anything in connection with the sale of a franchise that addresses whether the statute applies or not, and that's not the case. If you read the language of the statute, it says in connection with the offer of sale of a franchise, which that was not what the issue was in this case. Mr. Shalabi had, previous to the sale, he had leased this property from BP. The way that essentially all gasoline dealerships operate in these lease situations is the lease is the same document as the gasoline agreement. So by virtue of this sale, the gasoline agreement was going away. The reason that this sort of, I guess it was a renewal, you would say, was happening was because the sale was going to eliminate the lease, which was going to get rid of the gas agreement. So he had to execute some new agreement to have an ongoing relationship with the company. It was not something that was relevant for purposes of the real estate sales agreement, except that they needed some way to document that the relationship was going to be ongoing after the conclusion of the sale. So it was not integral in any way that is important. I would also add that typically renewals and terminations are governed by federal law under the Petroleum Marketing Practices Act, which preempts inconsistent state laws. And so to the extent that this was a renewal, it was, if anything, probably governed by federal law. This was not an issue, though, that was addressed in the trial court. I really want to focus on the issue that was discussed in the previous argument, which is I think one of the two dispositive issues on all of the claims in the case, which is the justifiable reliance element. And I think it's really important to look at the timeline of events that happened leading up to this transaction. First of all, Mr. Shalabi, prior to this sale, was a very sophisticated gasoline operator, he had operated three stations for five-plus years preceding this sale. He had previously purchased a gasoline station property and had dealt with the environmental issues associated with the purchase of the piece of property. And so this was not a situation where he was a new investor coming into this and was completely unaware of the requirements of dealing with a gasoline station purchase. Maybe you can just pause right there and address directly counsel's argument that, okay, fine, you know, there's not really a big dispute over the background facts here, but normally reasonableness is a question for the jury and maybe you have a great jury argument that you're just starting to articulate. Why isn't this something that a jury should resolve and most likely would resolve against the plaintiff? So I would agree with the statement that usually it is an issue that this needs to be resolved by a jury and that I don't frankly think that the lawyer's title case is any change in the law whatsoever. That case is just a restatement of the fact that this is normally a jury question unless reasonable minds couldn't differ on the question. Well, there is a Washington case that is essentially identical in the facts, holding that as a matter of law, reasonable minds can't differ in this kind of situation, and that's the Williams v. Jocelyn case. In that case, the Washington Supreme Court decided that a seller of real property who represented to a potential buyer that the property had an income producing potential of $1,000 couldn't be held liable for fraud because at the same time that that representation was made, the buyer had requested confirmation, additional information to back up that statement. The buyer was then provided with a document that was inconsistent with the original representation, which was receipts showing that it was only $400 in income. That's identical to the situation we have here. Mr. Shalabi reportedly received a copy of this e-mail. First representation, alleged misrepresentation was an e-mail saying there's no contamination, and attached to that e-mail was a copy of the report that would have disclosed that information. Under Washington law, under Williams v. Jocelyn, when you have two directly inconsistent statements, you have an obligation and a duty to investigate what that inconsistency is and determine why there is an inconsistency if you're going to be able to later claim that there was no reliance. They cite to the case of Scroggins v. Worthy, which is completely different. In that case, the Washington Supreme Court was dealing with a seller that made a similar representation about income potential piece of property but did not disclose that the property had actually been condemned. The buyer went to the property, and a third party, unknown to either of the two parties who happened to be present, mentions, oh, I think it's been condemned. You should probably ask about that. It was not a particularly reliable source, but the buyer, on her investigation, went and asked and said, is this true? And the seller said, no, no, it's not true. It hasn't been condemned, which was a restatement of the misrepresentation. In that case, the seller only made misrepresentations about the condition of the property. Everything that the seller said was not true. The court determined under those circumstances that the buyer was justified in relying on that statement because all of the information that it had received from the reliable source of the seller was incorrect. That's completely different than the situation when the same party provides both an incorrect and a correct statement of the facts, which is exactly what we have here. I might also add that the timeline is also important in determining whether or not reasonable minds could differ because Mr. Shalabi approached BP in October 2004 about the purchase, and they signed their agreement in October 2004 in which, as one of the provisions, he was granted the right to do any investigation that he wanted to do on the property within the 45 days following execution of the agreement. BP also agreed that it would do an investigation and that anything that that investigation revealed, it would clean up on its own dime. Well, 56 days later, so after the period of time that Mr. Shalabi had to do his own investigation and apparently did none, that was when he received a copy of the report, and it wasn't until the following day, 57 days later, that the first alleged misrepresentation was made. So any representations that he's purportedly relying on were made well after he had an opportunity to conduct his own due diligence on the property and failed to do so, and well after he signed an agreement saying, I'm not relying on any representations about the environmental condition of the property. Why was, I don't remember if I'm getting the number right, but there was some paragraph, paragraph 12 is what I'm remembering, was completely, there was a substitution basically? Correct. Why did that happen? So in, Mr. Shalabi received a copy of the report on December 10th, along with a declaration of environmental restrictions, which was another condition of signing on to the real estate sales agreement. And in that, he affirmatively waives any claim he has against BP, whether arising before or after closing related to the environmental condition of the property. This gets sent to him along with a copy of the report. His lender, one of the many members of his team that was helping him negotiate this transaction, objected and said, you know, he's about to conduct a major renovation of the property. He's going to tear out all the dispensers, expose all this ground, and if there's contamination that's found during that period of time, it's unfair that he would have to be responsible for that, and so we need some kind of protection for that. Four days later, BP complies and says, okay, that sounds fair. We're going to give you six months, which is the time frame that you're going to need to conduct, to do this renovation, and during that time you can do any investigation that you want on the property. And if you find anything, we'll indemnify you up to almost half a million dollars for cleanup costs. He never gets back to them. He conducts the entire investigation, presumably, and the construction of the property, and never responds to anything. So he had an opportunity at that point to do any investigation that he wanted. I think that that's a particularly important fact for the other issue that I think is dispositive that was never addressed by the trial court, which is the question of statute limitations. It's similar in the sense that it deals with the question of reliance, whether it was justified or not, and that's because under Washington law, any claim of fraud, whether it be common law, negligent misrepresentation, or a violation of the Gasoline Dealer Bill of Rights Act has a three-year limitations period. This case was filed in March of 2011, which means that either he had to have known, the fraud had to have been committed in March of 2008, or he would have, the discovery rule he would need to apply. So the only way he gets by this is with the discovery rule, and unlike fraud, on the discovery rule, he bears the burden of coming forward with evidence to show that he could not have discovered the facts giving rise to the fraud before the expiration of the limitations period. There's no exception that says if there's a misrepresentation that's made to you about a document, you don't have to read it for it to apply as it would in the justifiable reliance context. To the contrary, it is a requirement that you affirmatively have to go out and find information, and it's only if you cannot find that information because it is affirmatively being concealed by the opposing party that you get the benefit of the discovery rule. The idea being we don't want to perpetuate stale claims when you don't have a justified reason for trying to bring them forward. So typically the discovery rule would apply in a situation where there's a latent fact that only the seller of the real property knows, and they're intentionally withholding it from the buyer. An example that I've had previously in one of my cases was a seller of real property that had a problem with flooding, and so there would be floods that would cover over the road. Well, it's a piece of private property in the middle of nowhere. That's not going to show up on any records. There's not going to be any necessary damage from this because it's just the road getting covered with water, but it affects the access to the property. Buyer buys the property, doesn't know, asks specifically, is there any problem with flooding? Nope, there's no problem. You can't tell from an investigation, and it's only until it actually floods that they have noticed that, okay, maybe this was a problem. They go back to the seller and find out, okay, you were withholding that fact from me. That's completely different from here where Mr. Shalabi had in his filing cabinet a copy, multiple copies, three copies of the Delta report. But that's not what threw into question the deal five years later. It was contamination well beyond what was disclosed in that report, right? That's correct, but his contention is that you told me the property had no contamination. Not that it was no contamination requiring corrective action, just no contamination, and that's what I relied on, the fact that I thought it was in pristine condition. If you take that as true, and that's the allegation that he's made in this case, because if he were to take the opposite position, he would be stuck with having to deal with the fact that we disclosed to him that, you know, yeah, it's got a little bit of contamination, but it doesn't require cleanup. If you take that as true, I mean, he had a directly inconsistent document with him at that time that said, no, we found in monitoring wells one and three, we found petroleum hydrocarbons in levels above reporting limits, which is just it shows up on the report, but not at a level requiring cleanup. So let me just get the dates straight. This additional indemnification, if they discovered something, that came up in 2005? Correct. So the second amendment was executed on December 27, 2004, and he had a six-month period of time. And the reason they gave him six months is, according to Mr. Shalabi, was because the construction work couldn't happen until around the summertime, because that's when water levels go down, and then you can excavate without having a whole lot of water in the trench that you're digging. And so they gave him a six-month period of time to do any investigation he wanted in connection with his improvement. Thank you. Thank you, Your Honors. Just addressing the statute of limitations argument, that does go back to the exact same situation. Again, if Mr. Shalabi was not justified in relying on the representations made by BP, then he had an obligation to read the report, and that would have disclosed, and then the statute of limitations would have run. But if he was justified in relying on the representations that were being made to him, then there was no reason for him to read the report, and there would have been no reason for him to read the report at any time thereafter. It wasn't that he read the report years later that uncovered the problem. It was that there was discovery of a problem later on. What's your response to his reliance on the Williams versus Jocelyn case? Well, in that case, and I think their facts, again, is a little bit different here, is the fact that there was representations made, and then there was a request for documentation to verify those representations, and that was then provided, and then it wasn't followed up on. And so he had every opportunity, but it was clear he wasn't just relying on the representations. He actually then went and asked for additional documents. The difference here being he's being given the document, but at the same time BP is going out of its way to an effect, if you believe Mr. Shalabi or if you take the inferences in his favor, to discourage him from bothering to read the report. It's basically saying no contamination. Tell me where in the record there's some affirmative attempt on BP's part. I don't. It may not even have been an affirmative attempt, but it's the impact it's having on him to get repeated statements made to him that there's no contamination. Don't read the report?  No one actually went to the trouble of taking it. Well, that's what I'm saying. I mean, here's the report. We're telling you there's no contamination. Read for yourself. But my point is the difference between those two cases is there was a representation made, there was a request for documentation, and then there was no follow-up on it. In this case, the risk representations that are being made are having the impact of inducing him not to read the report, whether it was intentional or not. And then once, so then he never did read the report. He wasn't, he was asking for and on his guard and asking for additional information in the Jocelyn case. This case was, you'd have to look at the circumstances. In each of those circumstances, the question is, is the reliance reasonable in the circumstances of this case? And I submit that that's a question for the jury, not for the judge. Thank you. Thank you. The case of Chalabi v. Arco is submitted. Thank both of you for your argument this morning.
judges: Goodwin, McKeown, Watford